## Glass Coffee Brewer Corporation v. Embry.
### Nov. 6, 1942.

484

Robert Sloss, Willis & Sloss, Lawrence Grauman and Jesse H. Brown for appellant.

Morris & Garlove for appellee.

OPINION OF THE COURT BY JUDGE FULTON—Affirming in part, and reversing in part.

This appeal is from a judgment entered on a verdict for $8,860.71 in favor of appellee against appellant, an Illinois corporation, in an action to recover commissions on sales of appellant's product, a coffee brewer. A portion of the verdict, $621.62, was returned pursuant to direction of the court, while the balance was returned pursuant to an issue submitted to the jury.

Beginning with the year 1933 and continuing up to the time of matters giving rise to this litigation, the appellee had been engaged as a manufacturer's agent selling appellant's product in this state. He sold to jobbers only and merely solicited orders which were either accepted or rejected by appellant as it saw fit. Under the working agreement between appellant and appellee the latter received 10% commission on all sales made in Kentucky and his commission was payable even though sales were not made through his efforts. For three and a half years appellee continued to represent appellant on the agreed basis and also acted as manufacturer's agent or salesman for other companies. During the course of dealing appellant urged appellee to make strenuous efforts to secure the business of the Brown & Williamson Tobacco Corporation (hereinafter referred to as B. & W.), a company with principal offices in Louisville which gave away as premiums coffee brewers manufactured by appellant's competitors.

Appellee made a number of efforts to secure the B. & W. account and eventually was requested by the B. & W. buyer, Bentley, to quote prices on appellant's product. Upon receiving this request he communicated with appellant's home office in Chicago and requested assistance in securing the account. Pursuant to this request appellant sent its sales manager, Berlin, and its sales promotion manager, Blakeslee, to assist appellee. For this purpose appellant also employed F. L. McCabe, a premium sales specialist, to supplement the efforts of Berlin, Blakeslee and appellee. Blakeslee and appellee had a conference with the B. & W. buyer in which they advocated appellant's product. Berlin was advising on this matter but McCabe worked independently of the others in his contacts with B. & W. The usual sales price of appellant's product was a discount of 50% off the list price. B. & W., however, demanded a discount of 50% and 10% off the list price, or 10% more than was allowed to ordinary customers. The extra 10% was, of course, equivalent to appellee's regular commission. After Blakeslee and appellant had their sales talk with the B. & W. buyer, Blakeslee told appellee that if sales were made to B. & W. appellee would have to accept a smaller commission than he had been getting. Appellee, however, professed to treat this as a joke.

From the correspondence between appellant and

appellee it is apparent that appellant was desirous of keeping B. & W. under the impression that no salesman's commission was being paid on any order B. & W. might give. Appellant, quite naturally, seemed to have the idea that if B. & W. found out a commission was paid it would demand a further discount. Consequently, after the first order was received, appellant wrote appellee in part as follows:

"Please do not call on either Mr. Hendricks or Mr. Bentley unless we tell you to and do something specific. They don't want to have anything to do with a representative because they want to feel that they are buying directly from the factory and no salesman getting any commission on their business."

This letter also notified appellee that McCabe's usual commission in a matter of this kind was 5% but that in this instance McCabe had agreed to split his commission with appellee so that appellee would receive 2½% commission on the B. & W. orders instead of the 10% he had been receiving under the working arrangement. Appellee responded to this letter and insisted on the 10% commission and, in response to appellee's letter, appellant, on July 26, 1937, wrote appellee a letter refusing to pay more than 2½%. Again on August 25 appellant wrote appellee and concluded the letter by saying "We purposely didn't put a salesman's name on your order as Brown & Williamson asked for and got, the salesman's commission themselves." There was other correspondence between the parties concerning the commission and on September 8 appellant wrote appellee in effect that it was due to the efforts of McCabe and Blakeslee that the B. & W. order was secured. This letter closed with the following paragraph:

"I think it would be the height of foolishness for you to presume to thank Mr. Bentley for this business as he thinks that he has all of the salesman's commission and that nothing is being given anyone on it. The minute that you would thank him he would know that you were getting a commission and would immediately request that it be paid to them."

Later appellant forwarded a check to appellee for 2½% commissions on orders shipped B. & W. and on September 22 appellee returned this check. In an ef-

fort to adjust matters appellant sent its sales manager to Louisville to confer with appellee and a conference was had between appellant's representative and appellee and his brother. Appellant's agent at this time had with him a new contract which he desired appellee to sign pursuant to which appellee was guaranteed employment for one year. The original sales agreement was to continue for no specified time and was therefore terminable at the will of either party. Pursuant to the new contract offered appellee he was to receive 2½% commission on the B. & W. orders and 10% on all other orders.

The parties were unable to agree on a settlement and on October 5, 1937, appellee went to Chicago and conferred with appellant's president. Considerable argument occurred which finally terminated in appellant entering into a new contract and settlement in writing, pursuant to which appellant agreed to pay appellee a 5% commission on the present B. & W. order and credit him with 50% of the points and bonuses to which appellee would have been entitled on a contest being conducted by appellant had the entire B. & W. order been counted. On future B. &. W. orders appellee was to be paid 2½% commission and on other sales in Kentucky he was to be paid the customary 10% on the net billing price. The contract provided that it was to run from year to year but was subject to cancellation upon sixty day's notice by either party.

At this conference appellee says that appellant's president told him that B. & W. didn't want to buy through sales representatives and said to him that B. & W. were given "50% and 10 off the list, which was the salesman's commission." Appellee says that at this time appellant's president also stated that he was making some sort of new arrangements which would result in his severing connections with McCabe and that if this change was made it would be possible for appellant to make a more profitable arrangement with appellee and that he was assured that he could trust appellant to look after his interests and do the right thing by him and give him a better contract. It is pertinent, at this point, to state that before the conference in Chicago appellee had talked to the B. & W. buyer and had been informed by the buyer that he was not interested in the matter of commissions and didn't care how much appellee received as long as B. & W. got the best price that

could be gotten—in short, that B. & W. had absolutely no interest in the matter of commissions. Appellee had written and advised appellant of this information received by him before the conference in Chicago resulting in the new contract.

The original B. & W. order amounted to approximately $14,000, on which appellee, pursuant to the sales agreement then in force, would have been entitled to a commission of $1,400. After the making of the new contract appellant was paid commissions of $4,530.28 on B. & W. orders up to October 5, 1938, this being 5% on the original order and 2½% on subsequent orders and also included a sales contest bonus of approximately $400 allowed appellant under the new contract.

In July, 1938, appellant gave notice and terminated the contract at the expiration of the first year. Appellee made no protest on receiving the notice of termination but secured the agency to sell the product of one of appellant's competitors and visited appellant's customers in the endeavor to get them to change over to the new product he was handling. On January 23, 1939, he wrote appellant that there was a balance due him of $621.62 for commissions *pursuant to the October 5 contract*.

In this action filed by appellant he ignored the October 5 contract and sued for 10% commission on all B. & W. orders up to the time of the filing of the action. Appellant pleaded the October 5 contract and settlement thereunder in bar of the action and appellee thereupon attacked this contract on the ground that it was procured by fraud and duress. The trial court correctly ignored all allegations and purported evidence of fraud in so far as they dealt with the promise of appellant to give appellee a better contract in the future and, in addition to directing a verdict for $621.62 apparently due appellee under the new contract, instructed the jury to find for appellee on the basis of 10% commissions on the B. & W. orders for the one-year period covered by the new contract if the jury believed that at the time of entering into the contract of October 5, 1937, "and for the purpose of inducing plaintiff, Embry, to enter into said contract, the defendant's agents or servants falsely represented or stated to plaintiff that defendant had agreed with Brown & Williamson Tobacco Company that no salesman's commission would be paid with respect to the Brown & Wil-

liamson order concerning which you have heard evidence, and if you further believe from the evidence that the plaintiff believed and relied upon such statements or representations by defendant's agents or servants and was thereby induced to enter into said contract of October 5, 1937, and shall further believe from the evidence that the statements or representations so made by defendant's agents or servants, if they were made, were false and untrue and known by said defendant's agents or servants to be false and untrue, then you will find for the plaintiff, in addition to the sum stated in Instruction No. 1, in the further sum of $8,239.09.'' This instruction aptly submitted to the jury the fraudulent representation alleged in appellee's petition as amended.

A preliminary point to be disposed of is appellant's contention that the trial court erred in overruling its motion to quash the summons and return thereon. After appellee ceased his connection with appellant A. M. Peot succeeded him. Peot had been a representative of appellant in Florida and moved to Kentucky. He was representing appellant on a salary and commission basis. Peot's deposition was taken and read on the hearing of the motion to quash and from his testimony it appears that he was designated as ''territory manager'' for appellant. He had cards bearing this designation. He resided in Louisville, was employed on a salary and commission basis and, on at least one occasion, collected a delinquent jobber's account pursuant to directions from appellant. On one occasion also he assisted one jobber in making physical adjustments on some of appellant's merchandise. His duties also required him to call on jobbers in an effort to secure business and he contacted them constantly with the purpose of building up good will in appellant's behalf.

It is appellant's contention that Peot was only a manufacturer's agent and not an agent on whom process against appellant could be executed. In short, it is appellant's contention that it was not engaged in business in this state but only solicited orders which were accepted or rejected in Chicago.

Appellant is correct in its general contention that the business done in Kentucky by a distributor or manufacturer's agent is his own and not that of the foreign corporation from whom he buys, Barnes v. Maxwell Motor Sales Corporation, 172 Ky. 409, 189 S. W. 444, Ann.

Cas. 1917E, 578; Cox v. Phonograph Company, 208 Ky. 398, 280, S. W. 811, and in the general contention that the mere solicitation of business by an agent of a foreign corporation does not constitute the doing of business in such a way as to manifest the presence of the corporation in the state and to justify its enforced appearance in court by process executed on such agent, Makeever v. Georgia, etc., R. Co., 219 Ky. 699, 294 S. W. 144; People's Tobacco Co. v. American Tobacco Co., 246 U. S. 79, 38 S. Ct. 233, 62 L. Ed. 587, Ann. Cas. 1918C, 537. However, we think the facts here appearing are sufficient to establish that appellant was engaged in a continuous course of business in this state in the solicitation of orders sufficient to bring it within the rule announced in International Harvester Co. v. Com. of Kentucky, 234 U. S. 579, 34 S. Ct. 944, 58 L. Ed. 1479. The trial court was therefore correct in overruling the motion to quash the summons and return.

Coming now to the merits of the case, it is necessary to discuss first the item of $621.62 for which the court directed a verdict in appellee's behalf. In appellant's brief this is listed as one of the errors complained of but there is no argument or demonstration in the brief as to this claimed error. It seems apparent that some balance was due appellee under the October 5, 1937, contract and, in the absence of any showing that the trial court was in error as to this, we will assume the correctness of his finding.

On the main feature of the case, that is as to the propriety of the court's action in submitting the issue of fraud in the procurement of the October 5 contract to the jury, many interesting questions are raised and ably argued in the respective briefs but it is unnecessary to consider them in view of our conclusions (1) that there was no evidence whatever of fraud justifying a submission to the jury on this issue and (2) that even if such a false representation was made it was not material.

(1) Appellee does not anywhere in his testimony state that appellant's president, at the time of the making of the new contract, represented to him that it had been agreed beween appellant and B. & W. that no salesman's commission was to be paid on the B. & W. order. His only testimony in this regard was that appellant's president said to him that "they gave them 50 and 10 off the list, which was the salesman's commission." This

was true and appellee knew that B. & W. had been given 10% in addition to the discount received by regular customers and that 10% was the salesman's commission. Repeatedly, during the direct and cross examination of appellee, he was asked what fraudulent representations were made to him by appellant's president and in response to each of these questions he said in substance that appellant's president had told him he would have a better working arrangement, or would be given a better contract after the first of the year, which never materialized and that he was taking the word of appellant's president that a better arrangement would be made for him. In none of the letters written by appellant to appellee did appellant ever make any statement with reference to this commission matter reasonably calculated to deceive appellee. The import of these letters is clear, namely, that appellant did not want the B. & W. buyer to know that anyone was getting a salesman's commission and wanted to leave the buyer under the impression that no commission was being paid. Appellee was warned to keep away from the buyer in order that no impression might be created on him that appellee was getting a commission. This was apparently a very natural desire on appellant's part since it might well have been that B. & W. would want a further discount if they had known a substantial agent's commission was being paid although, as the B. & W. buyer no doubt truthfully testified, B. & W. was only interested in getting the best price that could be gotten and cared nothing about commissions. Nevertheless the B. & W. buyer might have concluded he could have gotten a better price than the one actually given if he had found out a commission was being paid. In any event, there was no room for misunderstanding about these letters and appellee necessarily knew that the only import of statements in the letters with reference to commissions was that B. & W. had been given the extra 10% discount which represented the usual salesman's commission.

Further, any such representations as were made in the letters as to B. & W. getting the agent's commission dealt only with a frame of mind or belief on the part of B. & W.'s buyer, that is, they were giving appellee to understand that the B. & W. buyer thought no agent's commission was being paid and that appellant did not desire the buyer's state of mind in this respect to be disabused for fear that more discount might be demanded.

492

Having thus been made acquainted by appellant with what it thought to be the B. & W. buyer's frame of mind or belief, appellee consulted the buyer and was given definitely to understand that it was immaterial to the buyer whether appellee or anyone else received commission—that the buyer's only desire was to get the best price possible. Appellee believed this statement of the buyer. He testified that he believed it at the time it was made. Thus he learned before the making of the new contract that such representations as had been made to him by appellant in this respect were not true in so far as the buyer's belief was concerned. He attempts to avoid the effect of the information imparted to him by the B. & W. buyer by saying that when appellant's president told him that B. & W. had asked for and received the salesman's commission and thought no salesman was receiving any commission he didn't know whom to believe.

A careful consideration of all the evidence, the mere highlights of which we have outlined above, leaves us firmly convinced that no false representation was made by appellant to appellee in regard to the salesman's commission; that appellee fully understood and realized the import of appellant's letters to him in this regard and of the statements made to him by appellant's president that B. & W. had asked for and gotten the salesman's commission. In view of this conclusion, the trial court was in error in submitting the case to the jury on this issue.

(2) Even though appellant falsely represented to appellee, as alleged in the petition, that it had agreed with B. & W. that no salesman's commission was to be paid on the B. & W. order, such a representation was not material. The authorities are unanimous in holding that facts misrepresented must have been material facts in order that there may be a recission of a contract by reason of such misrepresentation. 26 C. J. 1102, 23 A. J. 892. And, as stated in the text of the latter authority "the facts misrepresented or concealed must have been material facts *which substantially affect the interests of the person alleged to have been defrauded.*" We think this is a sound statement of the law. One may not avoid a contract he enters into by claiming that his adversary represented to him that the moon was made of green cheese and that he believed and relied on this misrepresenta-

tion and was thereby induced to enter into the contract since such a misrepresentation does not substantially affect his interests. As aptly stated in 23 A. J. 896:

> "In order to fall within the requisites of materiality essential to predication of fraud on their existence, representations must be relevant to the subject of a contract and must be as to some subject material to the contract itself, as distinguished from matters which are merely collateral thereto and do not constitute essential elements thereof."

After the original B. & W. order, amounting to $14,000, was secured appellee was entitled to a commission of $1,400 thereon and was fully aware of this fact. It was immaterial to him whether or not appellant had agreed with B. & W. that no salesman's commission was to be paid on the B. & W. order and it was further immaterial to him whether or not B. & W. believed that no salesman's commission was being paid. Any course of dealing between appellant and B. & W. did not, and could not, affect his rights to 10% commission. Appellee knew this, and so advised appellant, but also realized that his then existing contract could be immediately terminated and that he would receive no further commissions on B. & W. orders. Realizing that he would probably receive far more than $1,400 in commissions pursuant to the new contract, he entered into it with his eyes wide open. As a matter of fact he did receive pursuant to this new contract commissions amounting to far more than the $1,400 to which he was entitled when the new contract was made. While he takes the position that appellant represented that B. & W. thought no agent's commission was being paid and insists that such a representation was material, nevertheless he entered into the new contract by which a salesman's commission was to be paid to him on these very orders. We fail to see any particular in which the rights or interests of appellee were affected in the slightest even if the false representation he alleges was actually made—the alleged representation dealt with a collateral matter which constituted no essential element of the new contract.

The judgment is affirmed as to the item of $621.62 and reversed as to the item of $8,239.09 with directions to grant appellant a new trial and for further proceedings consistent with this opinion.